# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs May 15, 2019

## STATE OF TENNESSEE v. JOSEPH L. WARE

**Appeal from the Criminal Court for Davidson County**
**No. 2017-A-754      Angelita Blackshear Dalton, Judge**

_____

## No. M2018-01326-CCA-R3-CD

_____

The Defendant-Appellant, Joseph L. Ware, was convicted by a Davidson County jury of first degree felony murder (count 4), second degree murder (count 5), attempted especially aggravated robbery (count 6), attempted aggravated robbery (counts 3, 7), reckless endangerment (counts 8, 9), aggravated assault (count 10), and theft under $500 (counts 2, 11, 12), for which he received an effective sentence of life plus 10 years imprisonment. In this appeal as of right, the Defendant raises the following issues for our review: (1) whether the trial court "committed reversible error by the failure to charge the jury in the law regarding accomplice testimony;" (2) whether the trial court erred in admitting into evidence posts from the Defendant's Facebook page; (3) whether the prosecutors engaged in prosecutorial misconduct during closing argument by "emotional displays . . . calculated to inflame and/or play to the sympathies of the jury" thereby denying the Defendant a fair trial; (4) whether the evidence is sufficient to support the conviction of first degree felony murder; and (5) whether the trial court erred in imposing consecutive sentencing. Upon our review, we reverse and remand count eight for a new trial because felony reckless endangerment is not a lesser included offense of attempted first degree murder. In all other respects, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part and Reversed in Part**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

David A. Collins, Nashville, Tennessee, for the Defendant-Appellant, Joseph L. Ware.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Glenn Funk, District Attorney General; and Amy M. Hunter and Addie Askew, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

In the early morning hours of July 23, 2016, the Defendant and his co-defendant, Jamal Bekhtyar, engaged in a crime spree during which Billy Ray Plunk, one of the victims, was shot and killed. The Defendant admitted that he participated in the crime spree and that he shot and killed the victim, Billy Ray Plunk. However, he claimed that he "renounced or abandoned" his intent to rob the victim and that he shot the victim in self-defense. The following proof was adduced at the Defendant's trial, conducted on January 8-12, 2018.

Mary Beth Plunk, the mother of Billy Ray Plunk and Zachary Plunk (the Plunk brothers), testified that she and her husband raised four sons in Cheatham County, Tennessee. She identified the Defendant as someone with whom her sons were familiar from their neighborhood and said that he had been to their home to swim in their pool. She also identified a photograph of her son, Billy Ray Plunk, which was admitted as an exhibit.

Investigative Sergeant Richard Lowry of the Metropolitan Nashville Police Department (MNPD) testified that there were three related crime scenes in this case: a vehicle theft from the Marathon gas station, an attempted robbery from the apartment complex of Rebecca Mahaffey, and a homicide at the apartment complex of the Plunk brothers, all of which involved a similar vehicle. Investigator Lowry's initial involvement was in the attempted robbery of Rebecca Mahaffey, which involved a silver SUV "that was similar to the description of the homicide suspect vehicle." He explained that law enforcement had also received a report of a stolen SUV from a nearby Marathon gas station between one and two o'clock that same morning and that the license plate number to the stolen SUV was connected to several "beer runs" or thefts that had occurred the same morning. Officer Benjamin Cole testified that the day after the offenses, July 24, 2016, he recovered the vehicle stolen from the Marathon gas station, an "Infiniti SUV," within two blocks of the Marathon gas station. He testified that the license plate on the SUV when it was recovered, "W24-35X," did not match the stolen vehicle. The owner of the license plate, Braden Cameron, later confirmed that it had been stolen from his 2001 Dodge Ram van on or about July 23 or 24, 2016. Officer Charles Linville of the MNPD took photographs of the Infinity SUV and processed it for evidence. He also removed the license plate, from which he obtained fingerprint evidence to be analyzed by a latent fingerprint examiner. He identified the stolen license plate removed from the Infinity SUV, which was admitted as an exhibit at trial.

Daniel Ford, the assistant manager of the Twice Daily Shell gas station and convenience store in Davidson County, testified that sometime after 3:00 a.m. on the

morning of the offense his store "had a beer run." He explained that a "beer run" occurs when "people [] come in and grab as much beer as they can and just walk out the door and get in the car and leave." In this instance, two men came into the store. While one man stood in front of the assistant manager, the other man went to the back of the store to get the beer. Although the men were told that by law it was too late to purchase beer, they took the beer and walked out of the store without paying for it. The assistant manager testified that the estimated value of the beer was between $55 and $65, and that he did not give the men permission to take the beer from the store. The events as described by the assistant manager were recorded on the store's surveillance system, a video of which was admitted into evidence. The theft was subsequently reported to the police.

Yazid Fahhoury, a cashier at the BP Mapco, testified that around 5 a.m. on the morning of the offense "some guy" came into the store, grabbed some beer, and ran out of the store without paying. The cashier followed the thief outside and observed him get into a "silver car, SUV, Infinity FX35" with another man and drive away. The cashier wrote down the license plate number and called the police. The BP Mapco had a surveillance system that recorded the theft, a video of which was admitted at trial as an exhibit and played for the jury. The cashier did not know the man and did not give him permission to take the beer. The man took four cases of beer valued at $9.99 each.

Detective Trevor Von Dohlen was off duty on the day of the theft from the BP Mapco and preparing to go out of town on a trip. He had gone to the BP Mapco to fill his tires with air and entered the store to get quarters for the change machine. While in the store, Detective Dohlen observed a male white individual grab some beer and leave without paying. He followed the individual outside and observed him get into the passenger side of a "silver SUV, Infiniti." Detective Dohlen described the driver of the SUV as a "heavy set male black" with a tattoo between his eyes. Detective Dohlen recorded the license plate number and provided it to the store clerk. Upon returning from the trip, he researched the case and immediately recognized the two individuals connected to the stolen license plate number as the same individuals he had seen take the beer. At trial, he identified himself in the video from the BP Mapco that had been previously shown to the jury. Finally, he identified the Defendant at trial as the individual he observed as the driver of the SUV on the night of the theft.

Rebecca Mahaffey testified that around 5:20 a.m. on the morning of the offense, she was preparing to leave for summer vacation and was loading her two small children into her van. She had put her oldest child, age 7, in the van, and was about to retrieve her younger child, age 2, from her apartment when she observed an SUV enter her apartment complex. When she returned from getting her younger child, she noticed that the SUV had parked "in an awkward spot . . . very near to her van." She strapped her younger

child in the van and closed the door. As she walked around the rear of her van, a man approached her from the bushes with a gun. She said the man had a bandana around his face and said, "you're cool, I just want your money. You know, be cool, be cool." Mahaffey told the man that her purse was in the back of her van. When she opened the door, the man was "right on [her]" with the gun, and she asked him "to please not let the children see the gun." She testified further that she told the man that children were in the van prior to opening the door, but he did not retreat. She said the man put the gun behind his back and said, "I won't let them see it."

Mahaffey continued to get her bags from the back of her van. She was "fumbling" and "shaking" and set her bag on the ground. As she was kneeling on the ground going through her bag, she realized that she only had credit cards and no cash. She told the man that she did not have anything, and she feared her children might see her die. However, the man "stood there for a second . . . put his hands in the air, and he said, 'You know, what, I'm sorry. I have a horrible addiction pray for me' and he left." An aerial photograph and a map of Mahaffey's apartment complex were admitted as a collective exhibit. Although she was unable to identify the man, Mahaffey described him as an African American male, stocky build, 5'9" or 5'10", with braids that had rubber bands. She was also certain that there was another person inside the SUV. Following the offense, Mahaffey called the police. At trial, she identified a photograph of an SUV, admitted as exhibit 4, that was similar to the one she saw that morning during the offense.

MNPD Officer Clayton Lewis responded to the robbery call from Mahaffey at her apartment complex. He testified that while he was speaking with Mahaffey, another call was relayed over dispatch concerning a person that had been shot. The location of that offense was at an apartment complex only a mile away. Officer Steven Popp of the MNPD also responded to the call from Mahaffey's apartment complex and confirmed that another shooting call was relayed over his radio while Officer Lewis was interviewing Mahaffey. Officer Popp testified that the description of the perpetrator given by Mahaffey was similar to the description of the perpetrator of the shooting offense. Upon arrival at the apartment complex of the shooting, Officer Popp established a perimeter, set up crime scene tape, and eventually followed the ambulance to the hospital. Officer Popp determined that the victim of the shooting, Billy Ray Plunk, had died at approximately 6:30 that morning.

Zachery Plunk, age 24, testified that he was the youngest of the four Plunk brothers. He said that his brother, Billy Ray Plunk, was 29 years old and lived with him at the time of the offense. His brother was his best friend and had one child, age 3. On the morning of the offense, around 5:00 a.m., he and his brother woke up and left to get something to drink at the Twice Daily, which was minutes from their apartment. The brothers purchased their items and left the store without incident. Zachary drove back to

the apartment complex and parked his car.[1]  As he stepped out of his car, he was "looking down the barrel of a gun."  Zachary testified that a man then demanded "everything you got," and Zachary told him he did not have anything.  Zachary said that the man had the gun pointed at him while his brother was getting out of the car.  The man then demanded the same from his brother, who laughed, shook his head, and crossed his arms.  Zachary said his brother asked, "are you serious . . . I think I know you.  You look familiar."

The man angrily replied, "you don't know me" with the gun pointed at Billy Ray.  Zachary testified that his brother said, "okay," and began taking off his shirt.  When Billy Ray did so, the man "backed up a little bit so there was a little distance a little space between them."  Zachary said his brother made his way to the back of the perpetrator's SUV and got the license plate number.  At this point, his brother smiled and waved and started walking back toward Zachary.  Zachary said the man then started shooting and shot his brother in the back.  He heard two shots.  Zachary ducked down and got behind their car.  The man got in the perpetrator's SUV on the passenger side and the driver sped off.  Once Zachary got to his brother, he did everything he could to stop the bleeding and find the bullet holes.  He called the police, his family, and the ambulance.  He identified the Defendant at trial as the perpetrator of the offense.  Photographs depicting the scene were admitted into evidence.

Zachary admitted to calling the Defendant a "b---h" during the offense, but he denied calling him any racial slurs because the defendant had a gun on him.  Defense counsel then played a segment of Zachary's prior statement to police during which he said, "and I couldn't help [Billy Ray Plunk] and them god damn n-----s f---ing took him from me [.]"

Helen Wallace, a resident of the Plunk brother's apartment complex, testified that she awoke on the morning of the offense to the sound of gunshots.  She ran to her balcony and saw "a car pulling away with a gentleman on the passenger side reaching up shooting toward the sky and then the victim l[y]ing on the ground."  She described the car as a "hatchback" type vehicle.  She said two men were in the car.

Several officers with the MNPD responded to the scene at the Plunk brother's apartment complex and testified at trial.  Officer Ryan McManman "established" the crime scene, contacted medical personnel, briefly spoke with Zachary Plunk, and observed three shell casings on the scene.  Officer Kristen Morgan attempted to aid the shooting victim, and Officer Douglas Atwood called a tow truck to remove the victim's car for processing.  Officer Mark Rosenfeld took several photographs that were

---

[1] To avoid confusion, we will refer to witnesses with the same surname by their first name in this opinion.  We intend no disrespect.

subsequently admitted into evidence, and he also marked various items from the scene including a gray towel, a black shirt, the shooting victim's undershorts, a white shirt, and three shell casing, all of which were admitted as exhibits. Photographs of the stolen van were also admitted into evidence; however, no fingerprints were found. Photographs of the victims' car were taken and admitted into evidence. Officer Steven Jones created a crime scene diagram/sketch, which was also admitted into evidence.

Detective Barry Scarborough of the MNPD received the report of the BP Mapco theft and testified that the license plate and vehicle description recorded by the cashier matched the vehicle description involved in the attempted robbery and the shooting. Detective Scarborough also responded to the scene of the shooting and observed a bullet strike on a van "directly next to" the victims' vehicle. After receiving consent from the van owner, Detective Scarborough recovered a "nearly intact bullet round" or the nose of a bullet from inside the van. Detective Scarborough testified that the bullet round appeared to have been recently fired and that the owner of the van denied any knowledge of the bullet. After speaking further with the owner of the van, Detective Scarborough went to the Twice Daily to trace the Plunk Brothers' movement prior to the offense. Detective Scarborough obtained the video surveillance from the Twice Daily, and he testified that it showed the victims purchasing items and leaving the store. As the victims backed out of the parking lot, the video showed a silver SUV follow them. Detective Scarborough recovered the video for evidence, and it was admitted as an exhibit and played for the jury at trial. Detective Scarborough also assisted in retrieving the video from the scene of the SUV theft from the Marathon gas station. The video was admitted as an exhibit and played for the jury at trial. The video showed two individuals, one, later identified as co-defendant Jamal Bekhtyar, and another individual unrelated to this case. Co-defendant Bekhtyar is seen jumping into the driver's seat of the SUV and driving off, while the owner of the SUV "grabbed onto the vehicle."

Detective William Stokes, the lead investigator in this case, confirmed the timeline of events as previously testified to by other officers. He also created still photographs from the videos from the convenience stores, admitted as exhibits at trial, and distributed them department wide and to the media. He was later contacted by members of the Plunk family who identified the male black as the Defendant. He also received information from a federal probation officer identifying the co-defendant as Jamal Bekhtyar. Detective Stokes contacted Bekhtyar, who subsequently provided a statement admitting to his involvement in each of the offenses. Bekhtyar also identified himself in the still photographs and the Defendant from a photographic array. The photographic array was admitted as an exhibit at trial. Detective Stokes agreed that the weapon used was a .9mm semi-automatic, which ejects an empty cartridge after each firing unless there is a malfunction. He further agreed that the evidence supported the theory that the Defendant had a gun pointed at the Plunk brothers while he was backing away from them. Out of

the presence of the jury, there was much discussion concerning the truthfulness of statements made by Zachary Plunk to Detective Stokes, which were subsequently denied at trial. The parties ultimately agreed to play the entirety of Zachary Plunk's interview for the jury, which was admitted as an exhibit at trial.

Officer Michael Lynch of the MNPD testified that on July 25, 2016, he received a department wide email from Detective Stokes for assistance in identifying an individual in a still photograph. He identified the individual in the photograph as the Defendant and provided this information to Detective Stokes. Officer Lynch said that the Defendant had a unique hair style at the time because he had "red tips on his dreads."

Craig Tortorich, Zachary Plunk's cousin, testified that the Plunk brothers and the Defendant grew up together in Pegram, Tennessee. Although he was not "100 percent sure" that the Defendant had been to the Plunk's home, he believed the Defendant had been there because "he was always with the group and he was always with us." He saw the photograph distributed to the news media by Detective Stokes and called the police hotline to advise them that it was a photograph of the Defendant.

Co-defendant Jamal Bekhtyar testified that he was a drug addict and that he had gone to federal prison as a result of committing crimes to support his drug addiction. In July 2016, he was released from state custody and "ended up running into an old using friend" and "started shoplifting beer and other items" in exchange for drugs. He admitted to committing all the crimes that had been charged in this case with the Defendant. He said the theft of the SUV from the Marathon gas station was committed with another individual. He testified that although he had not been made any promises from the State in exchange for his testimony, he was hoping for a favorable offer on his charges. He detailed the events on the morning of the offense, narrated the video of the vehicle theft from the Marathon gas station, and identified himself in the video. Bekhtyar testified that, after the theft, he drove through an area, saw some "guys" who appeared to be selling cocaine, and that the Defendant approached the SUV. He testified that the Defendant told him that they did not have anything but that "you can get some in Tennessee Village." Bekhtyar testified that he had never met the Defendant prior to that day and that the Defendant told him his name was "BG." He identified the person he knew to be BG in court as the Defendant.

Bekhtyar testified that the Defendant got into the SUV on the passenger side and they drove to Tennessee Village, where they bought crack cocaine and "got high." He said the "high" lasted about ten minutes, and they wanted more drugs, so they did another beer run at the Twice Daily Shell gas station. He identified himself and the Defendant in the previously admitted video from the store surveillance camera, and he confirmed their participation in that theft. They went back to Tennessee Village, exchanged the beer for

drugs, and drank and got high again. When the high subsided, Bekhtyar drove the Defendant to Bellevue. He said that the Defendant told him that he had a friend in an apartment complex there and that Bekhtyar could easily steal beer from stores in that area. Bekhtyar dropped the Defendant off in an apartment complex, looked for a parking space, and eventually turned off the SUV. He later heard a woman scream and observed the Defendant with "a bandana on his face and a gun in his hand." Bekhtyar asked what was going on, and the Defendant told him to start the SUV. As Bekhtyar was driving off, he saw a woman crying. The Defendant told him that he would rob people in this area who appear vulnerable in the early morning hours "all the time," and no one got hurt.

Bekhtyar testified that they drove to the Twice Daily Shell gas station for yet another "beer run." Bekhtyar explained that his intent was to do the beer run and take the Defendant back to Tennessee Village for more drugs; however, the Defendant wanted Bekhtyar to take him to another apartment complex. Bekhtyar said he reluctantly agreed to take the Defendant to another apartment complex, but Bekhtyar "chicken[ed] out" and did not get out of the car. Bekhtyar testified that they went back to the same Twice Daily Shell gas station, and the Defendant had "an angry look on his face" while two men were walking out the front door. The Defendant told Bekhtyar, "'man, I know those guys,'" and instructed Bekhtyar to follow them. Without thinking much more about it, Bekhtyar complied. From the video previously admitted from the Twice Daily Shell gas station, Bekhtyar identified the SUV he drove and the point at which he commenced to follow the Plunk brothers.

Bekhtyar testified that he pulled into the apartment complex where the Plunk brothers had already parked their car. He said he stopped about two or three cars away from the rear of the Plunk brothers' car, and that the Defendant got out and approached the driver's side of their car. Bekhtyar noticed some commotion and then observed the Plunk brothers walking toward his SUV. At the same time, the Defendant was walking backwards toward his SUV with a gun in his hand pointed at the Plunk brothers. He described the position of the gun as "not really focused on either of [the Plunk brothers]. It's just up at this level, at shoulder level[.]" Bekhtyar rolled down his window and heard both of the Plunk brothers say "'we are going to get the license plate number. We know who you are. You are not going to get away with this.'" Bekhtyar did not hear the Defendant say anything in response. The Plunk brothers then walked away from the Defendant, past Bekhtyar on the driver's side, and approached the rear of the SUV. At this point, Bekhtyar said the Defendant was at the passenger side of the SUV and had opened the door. Bekhtyar testified that neither of the Plunk brothers had a weapon in their hands and that he did not hear any threats or racial slurs from the Plunk brothers toward the Defendant.

While the Plunk brothers were at the rear of the SUV, Bekhtyar observed that the Defendant was no longer at the passenger side, but the passenger door remained open. Bekhtyar then heard gunshots. He said the Plunk brothers were not "actively approaching" the Defendant as if to attack him. He did not see the Defendant shoot the gun, and he did not know where the Defendant was positioned when he shot the gun. He thought he heard a total of five gunshots, but only two or three rang out at the time the Plunk brothers were at the rear of the SUV. He said when the Defendant got back into the SUV, the Defendant fired shots out the window of the SUV. He described the direction of the gunfire as behind the SUV, which occurred as they were pulling off but still inside of the apartment complex. The Defendant and Bekhtyar eventually switched places in the SUV, and the Defendant drove Bekhtyar to another gas station for another beer run. Bekhtyar narrated another video previously admitted as an exhibit during which he identified himself as the person who took the beer and the Defendant as the driver of the SUV. They went back to Tennessee Village, exchanged the beer for drugs, and got high again. The Defendant and Bekhtyar then went to the Defendant's grandmother's home, where they removed a license plate from a van in a parking lot and put it on the stolen SUV. He identified a photograph previously admitted into evidence as the van from which they removed the license, as well as the license plate that they stole.

Bekhtyar testified that he agreed to do another beer run with the Defendant, but when he walked out of the store, the Defendant was gone. Bekhtyar later agreed to speak with police and identified himself as the individual in the still photograph from the vehicle theft at the Marathon gas station. He also identified the Defendant in a photographic array shown to him by Detective Stokes as the person who participated with him in the crimes as depicted in the videos.

Dr. Miguel Laboy, a medical examiner with the Middle Tennessee Regional Forensic Center, testified regarding the autopsy performed on the victim, Billy Ray Plunk. The autopsy report showed that he had been shot in the left arm and the bullet path "came out through the back on the outer side, that entry perforated the skin and soft tissue and exited on the inner side and then went in on the chest, perforated the skin and soft tissue of the chest, passed between the ribs, perforated the lung, fractured one of the ribs close to the spine . . . severed the spinal cord and exited on the back near the center close to the right middle." A copy of the autopsy report was admitted into evidence as an exhibit at trial. Dr. Laboy testified that Billy Ray Plunk's cause of death was determined to be "perforated indeterminate range gunshot wound of the chest[,]" and the manner of death was homicide.

Detective William Stokes was recalled by the defense and confirmed that three days after the offenses, he interviewed Bekhtyar. He did not recall Bekhtyar making any

statements regarding the victim, Billy Ray Plunk, saying that he was getting the license plate number or that the victim recognized the Defendant at the time of the offense. On cross-examination, Detective Stokes clarified that Bekhtyar told him that when they pulled into the Twice Daily Shell gas station, the Defendant "pointed to a white car and said that he knew them" and told Bekhtyar to follow them. He further testified that he collected messages from the Defendant's Facebook account pursuant to a search warrant. The Defendant's Facebook "handle" was identified as "BGizzle Ware" and had a photograph of him attached to it.

The Defendant testified and admitted that he (1) participated in the beer runs with Bekhtyar; (2) committed the attempted aggravated robbery of Rebecca Mahaffey; and (3) attempted to rob the Plunk brothers at gunpoint on the morning of the offense. The Defendant explained however that when he approached the Plunk brothers and said "give me what you got," they laughed and replied, "I got a Mountain Dew, ten bucks and a pack of cigarettes and you are not getting it n----r." The Defendant "paused" and felt like the Plunk brothers "hit [him] with some 1960's type stuff." The Defendant testified that he "left him alone," moved to the rear of the car, and observed "somebody reaching" in the floorboard trying to find something. The Defendant testified that Billy Ray Plunk then "pushed up" on him, took off his shirt, and said, "'Do you really want to do this?'" The Defendant said that Billy Ray Plunk had a bat in his hand, and later said, "'I know you, man.'" The Defendant testified that Zachary Plunk then said, "'b---h, we already told you that we don't have none and you're not getting it.'" The Defendant testified that he drew his arm back and told Billy Ray Plunk to stay away, but he continued to approach him with the bat. The Defendant simultaneously heard a clicking sound and observed Zachary Plunk open a knife. The Defendant testified that the Plunk brothers "tug[ged]" on his shirt and "whap[ped]" the top of his shoulder. While he was running away from them, the Defendant "just stuck [his] arm back there and fired three shots[.]"

The Defendant denied firing any shots while pulling away in the SUV. He also disputed Zachary Plunk's testimony that they were going to get the license plate number during the robbery. The Defendant testified that he did not intend to shoot anyone and that he did not realize he had done so until the next day. The Defendant denied that he recognized the Plunk brothers at the Twice Daily, and he denied telling Bekhtyar to follow them. The Defendant also insisted that he did not recognize Billy Ray Plunk during the offense. The Defendant said that he borrowed the gun used in the offenses from a friend and that he had given it back to him.

On cross-examination, the Defendant agreed that he had an extensive criminal history involving convictions of felony drugs, theft, criminal impersonation, and burglary of a vehicle. He agreed that he was a larger man than the Plunk brothers at the time of

the offense.  He also agreed that he had a Facebook account and that in October 2015, he posted the following:

> Mane Nigg's got a lota nerve . . . look hea mane, if I robbed you I promise you neva 4get it an probably most definitely wouldn't live to tell it.  West Nash up.  D.B.H. Gring Hard aye let me find out who got dey mouf on me an I will be to see you.

He explained that the above post was about song lyrics.  Over the Defendant's objection, the State also admitted into evidence a Facebook post from July 5, 2016, wherein the Defendant wrote the following:

> Mane all I see is red!  Any Nigga das done said anything wrong bout me nigga even looked at me sideways muthaf--ka you can get it!  Try me if you want too!  (2) I done lost my moma now my granny my life is really f---ed up now so I ain't got nuthin to loose!  I feel like killin sumthin!

The Defendant explained that this post was "just a figure of speech."  The Defendant agreed that he had taken a photograph of himself holding a gun and posted it on Facebook, a copy of which was also admitted at trial as an exhibit.  The Defendant agreed that he knew Detective Stokes wanted to speak with him about the shooting at the Plunk brother's apartment complex prior to his recorded statement because he had seen news reports of the offense on television and had spoken with his aunt about the offense.  The Defendant admitted that he was untruthful in his statement to Detective Stokes.  Specifically, in his statement, he denied being involved in multiple beer runs and limited his involvement to one; he denied any involvement in the attempted robbery of Rebecca Mahaffey; and he denied being present at the shooting when Billy Ray Plunk was killed.  He agreed that he falsely implicated another, "imaginary" person as being in the SUV with him and Bekhtyar during the beer run.

Based upon the above proof, the jury convicted the Defendant as charged of first degree felony murder (count 4), attempted aggravated robbery (count 3), attempted especially aggravated murder (count 6), aggravated assault (count 10) and each count of theft (2, 11, 12).  The jury also convicted the Defendant of lesser included offenses of second degree murder (count 5), attempted aggravated robbery (count 7), and reckless endangerment (counts 8, 9).  Following the verdict, the trial court imposed a sentence of life for the first degree felony murder of Billy Ray Plunk.  On February 23, 2018, the trial court conducted a sentencing hearing during which the presentence report was admitted into evidence.  Additionally, several members of the shooting victim's family testified regarding the impact of the victim's death including his mother and father, Mary-Beth and Wayne Plunk, his brothers, Zachary and Nathan Plunk, and his uncle, Donnie

Farthing. Following the proof, the trial court orally imposed upon the Defendant a sentence of life plus 10 years, as reflected in the chart below:

| COUNT | OFFENSE | VICTIM | CONVICTION OFFENSE | SENTENCE |
|---|---|---|---|---|
| 2 | THEFT U/ $500 | TWICE DAILY SHELL OIL | AS CHARGED | 11/29 (concurrent to count 4) |
| 3 | ATT. AGG. ROBBERY | REBECCA MAHAFFEY | AS CHARGED | 10 years (concurrently w/count 7; consecutive to count 4) |
| 4 | FELONY MURDER | BILLY RAY PLUNK | AS CHARGED | LIFE |
| 5 | FIRST DEGREE MURDER | BILLY RAY PLUNK | SECOND DEGREE MURDER | 35 years (merged w/ count 4) |
| 6 | ATT. ESP. AGG. ROBBERY | BILLY RAY PLUNK | AS CHARGED | 18 years |
| 7 | ATT. ESP. AGG. ROBBERY | ZACHARY PLUNK | ATT. AGG. ROBBERY | 10 years (concurrent w/ count 3; consecutive to count 4) |
| 8 | ATT. FIRST DEGREE MURDER | ZACHARY PLUNK | RECKLESS ENDANGERMENT | 3 years (merged w/count 9) |
| 9 | ATT. FIRST DEGREE FELONY MURDER | ZACHARY PLUNK | RECKLESS ENDANGERMENT | 3 years (merged w/ count 8) |
| 10 | AGGRAVATED ASSAULT | ZACHARY PLUNK | AS CHARGED | 8 years |
| 11 | THEFT U $500 | BP/MAPCO | AS CHARGED | 11/29 |
| 12 | THEFT U $500 | CAMERON BRADEN | AS CHARGED | 11/29 |

On June 22, 2018, the trial court conducted a hearing on the Defendant's motion for new trial, and subsequently denied the motion by written order on July 9, 2018. The Defendant filed a timely notice of appeal, and this case is now properly before this court for our review.

## ANALYSIS

**I. Jury Instruction on Accomplice Testimony.** The Defendant contends that the trial court "committed reversible error by the failure to charge the jury in the law regarding accomplice testimony." He further asserts that there was insufficient corroboration of the testimony of co-defendant/accomplice Bekhtyar. Because the

Defendant corroborated the testimony of his co-defendant/accomplice, the State contends that any error in not charging the jury on corroboration was harmless. We agree with the State.

When the trial court fails to instruct the jury on the issue of accomplice testimony, it is the defendant's responsibility to request such an instruction, and the defendant's failure to do so results in a waiver of the issue on appeal:

> [O]ur supreme court has held that an instruction on the rule requiring corroboration of an accomplice's testimony is not fundamental. Upon the trial court's failure to instruct the jury regarding accomplice testimony and the requirement of corroboration, it becomes the obligation of the defendant to make a special request for the instruction. In the absence of a special request, the trial court does not err by failing to instruct the jury about accomplice testimony even if the circumstances of the case warrant such an instruction.

> . . . .

> Upon the trial court's failure to instruct the jury on the issue of accomplice testimony, it became the defendant's responsibility to submit a special request. The failure to do so resulted in a waiver of the issue.

State v. Anderson, 985 S.W.2d 9, 17-18 (Tenn. Crim. App. 1997) (internal citations omitted); see State v. Bough, 152 S.W.3d 453, 464-65. The record shows that the trial court provided the parties with multiple opportunities to review and to contribute to the charge to the jury before its deliberations began. While defense counsel expressed concern about the self-defense instruction, he did not request an instruction concerning accomplice testimony. Accordingly, this issue is waived.

When a jury instruction is waived for failure to request it in writing, an appellate court may still review the issue for plain error. State v. Page, 184 S.W.3d 233, 230 (Tenn. 2006). The plain error doctrine states that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). In order for this court to find plain error,

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the

- 13 -

accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

Smith, 24 S.W.3d at 282 (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "It is the accused's burden to persuade an appellate court that the trial court committed plain error." State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007) (citing U.S. v. Olano, 507 U.S. 725, 734 (1993)). "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283.

In this case, Bekhtyar was an accomplice as a matter of law, see State v. Collier, 411 S.W.3d 886, 894 (Tenn. 2013), and therefore, the trial court erred in failing to give the jury an accomplice instruction on corroboration. A trial court's failure to give an accomplice instruction is harmless where there is sufficient corroboration of the accomplice's testimony. See State v. Ballinger, 93 S.W.3d 881, 888 (Tenn. Crim. App. 2001). Here, the Defendant testified and admitted that he was present during the robbery of the Plunks and that he fired shots at them in self-defense. Zachary Plunk also testified and substantially corroborated the testimony of co-defendant/accomplice Bekhtyar. Accordingly, we conclude that the accomplice testimony was sufficiently corroborated. Because consideration of the error is not necessary to do substantial justice, the Defendant is not entitled to plain error relief on this issue.

**II. Admissibility of Facebook Posts:** The Defendant argues that the trial court erred in admitting into evidence posts from the Defendant's Facebook page. He insists that "the information on said page" was not relevant to the Defendant's state of mind at the time of the offense, and even if it were, any probative value was outweighed by its prejudicial effect. Because the Defendant raised the issue of self-defense and his propensity for non-violence, the State argues that his Facebook posts contradicting his claims of self-defense were relevant to the jury deliberations. The State further argues that because the posts were directed at the element of premeditation, which was rejected by the jury, any error in the admission of the posts was harmless. We agree with the State.

On direct examination, the Defendant testified that "robbing just ain't me. I don't have a history of that. I don't do that, that kind of stuff." Although he admitted to his criminal history, the Defendant again later denied committing "robberies, no attempted robberies, no murders, nothing violent or nothing of that sort." On cross-examination, the State impeached the Defendant's testimony with a Facebook post from October 2015, in which the Defendant said, "if I robbed you I promise you neva 4get it an probably most definitely wouldn't live to tell it." The State then attempted to question the

Defendant further about another Facebook post from July 5, 2016, and the Defendant objected based on relevance. The State then argued that the post was relevant to the Defendant's state of mind and refuted his claim of accidental shooting. Following argument, the trial court admitted the post, reasoning that its probative value outweighed its prejudicial effect.

The admissibility of evidence rests within the trial court's sound discretion, and this court will not overturn a trial court's decision regarding the admissibility of the evidence absent an abuse of that discretion. State v. Clayton, 535 S.W.3d 829, 859 (Tenn. 2017). A trial court is found to have abused its discretion when it "applies an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" Lewis, 235 S.W.3d at 141 (quoting State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006)). Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Evidence which is not determined to be relevant is inadmissible. Tenn. R. Evid. 402. In addition, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Unfair prejudice has been defined by the Tennessee Supreme Court as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily an emotional one.'" State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Fed. R. Evid. 403, Advisory Committee Notes). "Prejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'" State v. Young, 196 S.W.3d 85, 106 (Tenn. 2006) (citations and internal quotation marks omitted). Whether evidence is relevant is a decision left to the discretion of the trial court, and this court will not overturn a trial court's determination regarding relevancy without a showing that the trial court abused its discretion. State v. Brown, 373 S.W.3d 565, 573 (Tenn. Crim. App. 2011) (citing State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995)).

The Facebook post at issue was posted on July 5, 2016, and stated, in relevant part, if anyone "even looked at me sideways muthaf---a you can get it! Try me if you want too!" (2) "I done lost my moma now my granny my life is really f---ed up now so I ain't got nuthin to loose! I feel like killin sumthin!" We conclude that this was relevant, albeit marginally, to the Defendant's defense theory of renunciation and abandonment. However, in weighing whether the probative value of the July 5, 2016 Facebook post was substantially outweighed by its prejudicial effect, we observe that the Facebook post did not specifically refer to the Plunk brothers and was general in nature. Moreover, it appears to be an expression of anger as a result of the death of the Defendant's mother

- 15 -

and grandmother rather than anything connected to the instant crimes. Finally, the State had already impeached the Defendant with the October 2015 Facebook post, and there was other evidence from Zachary Plunk and codefendant Bekhtyar establishing that the Defendant had shot Billy Ray Plunk, in the perpetration of an attempted especially aggravated robbery. In our view, the undisputed evidence of the Defendant's intent makes the probative value of the July 5, 2016 Facebook post far less compelling. Under these circumstances, we conclude that the trial court erred in admitting the July 5, 2016 Facebook post; however, its erroneous admission was harmless in light of the overwhelming evidence of the Defendant's guilt in this case. The Defendant is not entitled to relief.

**III.** **Prosecutorial Misconduct.** Next, the Defendant contends that the prosecutors engaged in prosecutorial misconduct during closing argument by "emotional displays . . . calculated to inflame and/or play to the sympathies of the jury." He does not challenge any remarks made by the prosecutor, but rather, he insists that the prosecutor engaged in "theatrics" and "appeared to 'choke back tears'" while referencing the testimony of Zachary Plunk holding the body of his dying brother in the parking lot. The Defendant argues that the behavior of the State "prejudice[d] the jury against [him and] . . . thereby denied him a fair trial." In response, the State points out that the Defendant did not object during the State's closing argument and that he has failed to establish plain error relief. We agree with the State.

The Tennessee Supreme Court has repeatedly noted that "[c]losing argument is a valuable privilege that should not be unduly restricted." State v. Stephenson, 195 S.W.3d 574, 603 (Tenn. 2006) (citing State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001)). The trial court has substantial discretion in controlling the course of arguments and will not be reversed unless there is an abuse of that discretion. Id. In addition, prosecutorial misconduct does not constitute reversible error absent a showing that it has affected the outcome of the trial to the prejudice of the defendant. Id. (citing Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001)). However, an attorney's comments during closing argument "'must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried.'" State v. Gann, 251 S.W.3d 446, 459 (Tenn. Crim. App. 2007) (quoting State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978)). In order to be entitled to relief on appeal, the defendant must "show that the argument of the prosecutor was so inflammatory or the conduct so improper that it affected the verdict to his detriment." State v. Farmer, 927 S.W.2d 582, 591 (Tenn. Crim. App. 1996). This court must consider the following factors when determining whether the argument of the prosecutor was so inflammatory or improper to negatively affect the verdict:

(1) the conduct complained of viewed in the light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecution; (3) the intent of the prosecutor in making the improper arguments; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength and weakness of the case.

State v. Chalmers, 28 S.W.3d 913, 917 (Tenn. 2000) (citations omitted).

Although the Defendant vehemently condemns the conduct of the prosecutors during closing argument, it is remarkable that he failed to lodge a contemporaneous objection during the alleged "theatrics" at trial. The Defendant's failure to do so limits our review of this issue to plain error. Tenn. R. App. P. 36(b); State v. Pack, 421 S.W.3d 629, 648 (Tenn. Crim. App. 2013) (holding that because the defendant failed to make a contemporaneous objection during closing arguments, he not only had to establish that the comments were improper but also that they constituted plain error). It is well recognized that a defendant's failure to object to a prosecutor's comments during closing argument rarely results in a reversal of the conviction. See United States v. Smith, 508 F.3d 861, 864 (8th Cir. 2007).

We conclude that the Defendant has failed to establish plain error. The record shows that the Defendant raised this issue in his motion for a new trial, which was denied by the trial court. The trial court reasoned, in relevant part, that while the prosecutor's arguments "may seem passionate," they were not improper. Upon our review, we agree with the trial court. As recognized by the Defendant, it is difficult, if not impossible, for this court to evaluate the pitch or emotion in the voice of an individual, especially in the absence of a contemporaneous objection. The Defendant invites this court to consider the fact that the prosecutor did not deny the allegation at the motion for new trial as evidence of misconduct, which we decline to do. The record is simply devoid of any evidence that the argument of the prosecutors disrupted the case or improperly appealed to the emotions of the jury. To the contrary, the jury weighed the evidence, separated the "wheat from the chaff," and returned verdicts convicting the Defendant of three lesser included offenses in counts seven, eight, and nine, all to his benefit. Because the Defendant has failed to establish that review of this issue is necessary to do substantial justice, he is not entitled to relief.

**IV. Sufficiency of Evidence.** Next, the Defendant argues the insufficiency of the evidence supporting "the most serious charges." In his brief on appeal, the Defendant does not challenge any of the elements of the offenses, but instead, he attacks the credibility of Zachary Plunk and co-defendant Bekhtyar. In response, the State contends,

and we agree, that the evidence is sufficient to support the Defendant's conviction of felony murder.

Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Parker, 350 S.W.3d 883, 903 (Tenn. 2011) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court shall not substitute its inferences for those drawn by the trier of fact. Id.

In this case, the Defendant was convicted as charged of first degree felony murder, attempted especially aggravated robbery, and two counts of attempted aggravated robbery. As relevant here, first degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any ... robbery[.]" Tenn. Code Ann. § 39-13-202(a)(2) (Supp. 2011). No culpable mental state is required for conviction of felony murder except the intent to commit the underlying felony. Id. § 39-13-202(b) (Supp. 2011). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Id. § 39-13-401(a). Especially aggravated robbery is robbery, as defined in Code section 39-13-401, which is

- 18 -

accomplished with a deadly weapon and where the victim suffers serious bodily injury. Id. §§ 39-13-401, -403. Aggravated robbery is robbery as previously defined which is accomplished with a deadly weapon. Id. § 39-13-402.

Viewing the evidence in the light most favorable to the State, the Defendant participated in several thefts of gas station convenience stores in the Bellevue area of Nashville. While armed with a gun, the Defendant also attempted to rob Rebecca Mahaffey. The Defendant then attempted to rob the Plunk brothers. Although the Defendant testified that he retreated from the robbery and only shot at the Plunk brothers in self-defense, the jury rejected this theory, as was its prerogative. The Defendant's argument concerning the sufficiency of the evidence focuses solely on the testimony of Zachary Plunk and co-defendant Bekhtyar. The Defendant insists that these witnesses "changed [their] story" and provided inconsistent testimony at trial. The resolution of questions of fact, including witness credibility, is within the sole province of the jury. By its verdict, the jury accredited the testimony of Zachary Plunk and Bekhtyar, and it resolved any inconsistencies in their testimony in favor of the State. State v. Thompson, 36 S.W.3d 102, 107 (Tenn. Crim. App. 2000); State v. Stephens, 264 S.W.3d 719, 740 (Tenn. Crim. App. 2007). Accordingly, the evidence is sufficient to support the Defendant's convictions of first degree felony murder, attempted especially aggravated robbery, and two counts of attempted aggravated robbery. He is not entitled to relief.

**V. Sentencing.** The Defendant contends that the trial court erred in imposing consecutive sentencing. In his brief, the Defendant does not articulate how the trial court erred in its sentencing order. Instead, citing State v. Desirey, 909 S.W.2d 20 (Tenn. Crim. App. 1995), the Defendant appears to argue that his sentence is excessive because he would be age 86 once he became eligible for parole and "to pile on additional time in the form of consecutive sentences violates the principles stated in Desirey[.]" In response, the State contends, and we agree, that the trial court did not err in imposing consecutive sentencing in this case.

Where a defendant is convicted of one or more offenses, the trial court has discretion in determining whether the sentences shall be served concurrently or consecutively. Tenn. Code Ann. § 40-35-115(a). "[T]he abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations." State v. Pollard, 432 S.W.3d 851, 860 (Tenn. 2013). A trial court may order multiple offenses to be served consecutively if it finds by a preponderance of the evidence that a defendant fits into at least one of the seven categories in section 40-35-115(b). Tenn. Code Ann. § 40-35-115(b). This court must give "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in

Tennessee Code Annotated section 40-35-115(b)." Pollard, 432 S.W.3d at 861. An order of consecutive sentencing must be "justly deserved in relation to the seriousness of the offense." Tenn. Code Ann. § 40-35-102(1); see State v. Imfeld, 70 S.W.3d 698, 708 (Tenn. 2002). In addition, the length of a consecutive sentence must be "no greater than that deserved for the offense committed." Tenn. Code Ann. § 40-35-103(2); see Imfeld, 70 S.W.3d at 708.

In this case, the trial court sentenced the Defendant to concurrent terms of 10 years for the attempted aggravated robbery of Rebecca Mahaffey (count 3) and 10 years for the attempted aggravated robbery of Zachary Plunk (count 7). The trial court ordered these counts to be served consecutively to the first degree felony murder of Billy Ray Plunk, for an effective sentence of life plus 10 years. At the sentencing hearing, the trial court determined that the Defendant was a Range II, multiple offender based on his extensive criminal history which included convictions for theft, criminal impersonation, criminal trespass, misdemeanor drug offenses, and harassment. The trial court imposed consecutive sentencing upon finding that the Defendant was a professional criminal and that he had an extensive history of criminal activity. See Tenn. Code Ann. §40-35-115(b)(1), (2).

The Defendant's reliance on Desirey, a bribery of a public official case, is misplaced. In Desirey, the defendant argued that the 18-year aggregate of his sentences was not reasonably related to the severity of the offenses and that consecutive sentences were not justified under all the existing circumstances. Desirey, 909 S.W.2d at 32. Upon de novo review, we reversed the trial court's order of consecutive sentencing, and noted that there was "no indication that the trial court made an assessment of whether or not an [18]-year aggregate sentence was needed to protect society from the defendant's future criminal conduct or of whether or not such a sentence reasonably related to the severity of the offenses." Id. We further observed that the record did not contain substantial evidence to support a finding that the aggregate length of the defendant's sentence was necessary to protect the public from his further criminal conduct and that the record showed that the defendant, who was gainfully employed and had successfully completed a term in a halfway house, had "substantial potential for rehabilitation." Desirey, 909 S.W.2d at 33-34.

In contrast to Desirey, the Defendant's life plus 10-year aggregate sentence involved convictions with separate victims and were for violent offenses. The Defendant was unemployed, had a substantial criminal history, was a gang member, and gave chilling testimony at trial regarding how he intentionally targeted victims whom he believed were vulnerable to get easy money. The Defendant's primary complaint now is that there will be no need to protect society from him at age 86, when he is eligible for parole. However, this is a consequence of the Defendant's automatic life sentence and

- 20 -

not the trial court's order of consecutive sentencing. Because the record fully supports the imposition of consecutive sentencing in this case, the Defendant is not entitled to relief.

Finally, although not addressed by the parties, we observe that in count eight, the attempted first degree murder of Zachary Plunk, the trial court instructed the jury with felony reckless endangerment as a lesser included offense, which was error. See State v. Rush, 50 S.W.3d 424, 431 (Tenn. 2001), as amended (July 25, 2001) ("Because proof of use of a deadly weapon is always required for a felony reckless endangerment conviction but is not required for an attempted second degree murder conviction . . . felony reckless endangerment is not a lesser-included offense of attempted second degree murder[.]"). Accordingly, we reverse the Defendant's conviction for felony reckless endangerment with a deadly weapon and remand for a new trial as to that count. See State v. Travis Grover Richardson, No. E2013-02250-CCA-R3CD, 2014 WL 5099585, at *8 (Tenn. Crim. App. Oct. 10, 2014) (noting that the Defendant cannot be retried for attempted second degree murder and remanding for a new trial on all offenses which qualify under Tennessee Code Annotated sections 40-18-110(f) or (g) as lesser-included offenses of attempted second degree murder).

## CONCLUSION

Based on the above authority and analysis, we reverse and remand count eight for a new trial. In all other respects, we affirm the judgments of the trial court.

_____
CAMILLE R. MCMULLEN, JUDGE